**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN EVANS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JAGUAR LAND ROVER AUTOMOTIVE PLC; and JAGUAR LAND ROVER OF NORTH AMERICA, LLC,<br><br>Defendants. | Case No.: 1:26-CV-0310 (AMN/PJE)<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Brian Evans, individually and on behalf of all others similarly situated, bring this Complaint against Jaguar Land Rover Automotive PLC and Jaguar Land Rover of North America, LLC (Collectively "JLR" or "Defendants"). Plaintiff alleges the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief:

## INTRODUCTION

1. This consumer class action arises from a latent defect found in model year ("MY") 2018-2023 JLR Range Rover Velar, Range Rover Evoque, Land Rover Discovery, and Jaguar F-Pace vehicles (hereafter, the "Class Vehicles").[1]

2. This action arises from Defendants' failure, despite its longstanding knowledge, to disclose to Plaintiffs and other consumers that the Class Vehicles contain a defectively designed and/or manufactured electronic power steering (EPS).

3. In the Class Vehicles, the EPS motor and electronic control module are integrated

[1] Plaintiff reserves the right to amend the definition of the Class Vehicles after conducting discovery.

into the steering rack assembly, which is mounted low at the front of the vehicle on the subframe, beneath the engine bay and in close proximity to the wheel wells and underbody splash zones. This location places the EPS unit directly in an area routinely exposed to water, road spray, snow melt, and environmental moisture during ordinary and foreseeable driving and vehicle washing. Despite being installed in this high-exposure location, the EPS system is housed in a casing that is inadequately sealed against water intrusion. As a result, water and moisture are able to enter the EPS housing through seams, gaskets, wiring pass-throughs, or connector interfaces, where they contact and damage sensitive electronic components within the EPS control module and motor assembly. When water intrusion occurs, the EPS electronics are subject to corrosion, short-circuiting, and electronic degradation, which causes intermittent or sudden loss of steering assist. The defect may manifest as warning messages, unpredictable changes in steering effort, or complete loss of power steering assistance, often without prior warning and during normal vehicle operation ("Steering Defect" or "Defect").

4. Because the EPS system is both safety-critical and electronically controlled, its failure significantly increases the risk of loss of vehicle control. The sudden reduction or loss of steering assist requires drivers to exert substantially greater steering force than expected, particularly during low-speed maneuvers and turns, thereby creating an unreasonable safety hazard.

5. Not only did Defendants actively conceal the fact that the Class Vehicles were prone to the Defect, which could result in the failure of power steering and other dangerous situations (and require costly repairs to fix), but they also did not reveal that the existence of this Defect would diminish the intrinsic and resale value of the Class Vehicles.

6. Defendants have long been aware of the Defect. Despite their longstanding

knowledge, Defendants have been unable or unwilling to adequately repair the Class Vehicles for free when the Defect manifests.

7. Many owners and lessees of the Class Vehicles have communicated with Defendants and their agents to request that they remedy and/or address the Defect at Defendants' expense. Defendants have failed and/or refused to do so, often conveying to owners and lessees that the Class Vehicles are operating as intended. Once the Class Vehicles fall outside the warranty period, Defendants then charge the owners and lessees for the costly repairs necessitated by the Defect.

8. Defendants have also refused to take any action to correct this concealed Defect when it manifests in the Class Vehicles outside of the warranty period, despite extending the warranty and issuing a recall for a similar issue in Canada.[2] Because the Defect can manifest shortly outside of the warranty period for the Class Vehicles—and given Defendants' knowledge of this concealed, safety-related defect—Defendants' attempt to limit the warranty with respect to the Defect is unconscionable and unenforceable here.

9. As a result of Defendants' unfair, deceptive, and/or fraudulent business practices, owners and lessees of the Class Vehicles, including Plaintiff, have suffered an ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices committed by Defendants were conducted in a manner giving rise to substantial aggravating circumstances.

10. Despite notice and knowledge of the Defect from the numerous complaints they have received, information received from dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and their own internal records, including pre-sale

[2] https://wwwapps.tc.gc.ca/Saf-Sec-Sur/7/VRDB-BDRV/search-recherche/detail.aspx?lang=eng&rn=2019473 (last visited February 20, 2026)

durability testing, Defendants have not recalled and/or offered an adequate repair to the Class Vehicles, offered their customers suitable repairs or replacements free of charge, or offered to reimburse their customers who have incurred out-of-pocket expenses to repair the Defect.

11. Had Plaintiff and other Class Members known of the Defect at the time of purchase or lease, they would not have bought or leased their Class Vehicles or would have paid substantially less for them.

12. As a result of the Defect and the monetary costs associated with attempting to repair the Defect, Plaintiff and the Class have suffered injury in fact, incurred damages, and have otherwise been harmed by Defendants' conduct.

13. This case seeks protection and relief for owners and lessees of the Class Vehicles for the harm they have suffered, and the safety risks they face, from Defendants' breaches of express and implied warranties, Defendants' unfair, unlawful, and deceptive trade practices, and for common law fraud and unjust enrichment.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

15. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this district, Defendants transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district. Additionally, a

substantial part of the events or omissions giving rise to the claim occurred in this district, Defendants have advertised in this district, and Defendants have received substantial revenue and profits from its sales and/or leasing of Class Vehicles in this district.

16. This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within the state of New York and throughout the United States.

## THE PARTIES

**Plaintiff Brian Evans**

17. Plaintiff Evans is a citizen of New York who currently resides in Latham, NY and has at all times pertinent to this Complaint.

18. Plaintiff Evans purchased a pre-owned 2018 Range Rover Velar SE R Dynamic on February 10, 2021, from DeNooyer Chevrolet ("DeNooyer") located in Colonie, New York.

19. Plaintiff Evans purchased (and still owns) this vehicle, which is used for personal, and/or household use. His vehicle bears Vehicle Identification Number: SALYL2RX4JA771653.

20. Prior to purchase, Plaintiff Evans discussed the features of the vehicle with sales representatives at DeNooyer and reviewed materials that came with the vehicle. None of these sources disclosed the Defect to Plaintiff Evans.

21. Indeed, the sales representatives told Plaintiff Evans that the vehicle had been thoroughly inspected by DeNooyer and was free from any issues.

22. On or about September 25, 2025, when Plaintiff Evans's vehicle had approximately 65,000 miles on the odometer, he drove the vehicle in the rain for approximately four (4) miles. He did not drive through any significant puddles or deep water.

23. While attempting to drive his vehicle home that day, Plaintiff's power steering

failed on his vehicle.

24. On September 29, 2025, Plaintiff Evans brought his vehicle to McGovern Jaguar Land Rover in Albany, New York. The dealer inspected his vehicle and determined that his EPS system had failed, and his vehicle would require replacement of the entire steering rack assembly, in addition to other related repairs. Plaintiff Evans was quoted $7,655.86 to perform the repairs. The Service Manager also told Plaintiff that this was a common occurrence and he had a customer in the week prior with a Jaguar F-Pace with the same issue.

25. Because this is a known issue on Defendants' vehicles, Plaintiff requested that the cost of repairs be covered under warranty. JLR denied Plaintiff's warranty claim. They offered to cover 50% of the repair cost, leaving Plaintiff to pay in excess of $3,500 to repair his power steering.

26. Plaintiff Evans has suffered an ascertainable loss as a result of Defendants' omissions associated with the Defect, including, but not limited to, out of pocket loss associated with the Defect and diminished value of his vehicle.

27. Neither Defendants, nor any of their agents, dealers, or other representatives informed Plaintiff of the existence of the Defect prior to purchase. Had Defendants disclosed the Defect to Plaintiff Evans, he would not have purchased his vehicle or would have paid less for it.

28. On February 2, 2026, Plaintiff sent a letter to Defendants formally advising them of the violations New York General Business Laws, §§ 349 and 350, et seq., breach of express and implied warranty and other violations ("Pre-suit Notice"). Plaintiff requested that Defendants cure those violations and provide other specified relief within 30 days.

29. On February 10, 2026, Defendants responded to the Pre-suit Notice and advised

that they " are declining to offer you the relief you have requested."

**Defendants**

30. Defendants are an automobile design, manufacturing, distribution, and/or service corporation doing business within the United States. Furthermore, Defendants design, develop, manufacture, distribute, market, sell, lease, warrant, service, and repair passenger vehicles, including the Class Vehicles.

31. Defendant Jaguar Land Rover Automotive PLC (JLR-UK) is a corporation organized and existing under the laws of England, with its principal place of business located in Coventry, United Kingdom. JLR-UK is the parent corporation of Jaguar Land Rover of North America

32. Defendant Jaguar Land Rover of North America, LLC ("JLR-NA") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Mahwah, New Jersey. JLR-NA is JLR-UK's U.S. sales and marketing division, which oversees sales and other operations across the United States. JLR-NA distributes JLR vehicles and sells these vehicles through its network of dealers. Money received from the purchase of a JLR vehicle from a dealership flows from the dealer to JLR-NA.

33. JLR-NA and JLR-UK sell JLR vehicles through a network of dealerships that are the agents of JLR-NA and JLR-UK. There exists, and at all times herein existed, a unity of ownership between JLR-NA, JLR-UK and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others.

34. Upon information and belief, Defendant JLR-UK communicates with Defendant JLR-NA concerning virtually all aspects of the JLR products it distributes within the United States.

35. Upon information and belief, the design, manufacture, distribution, service, repair, modification, installation, and decisions regarding the Class Vehicle engines, as it relates to the Defect, were performed exclusively by Defendants JLR-NA and JLR-UK.

36. Upon information and belief, Defendants JLR-NA and JLR-UK developed the post-purchase owner's manuals, warranty booklets and information included in maintenance recommendations and/or schedules for the Class Vehicles.

37. Defendants also jointly design, determine the substance of, and supply the Class Vehicles with warranty manuals, maintenance manuals, booklets, warnings and the window stickers visible on every Class Vehicle. Defendants control the content of these materials—their authorized dealerships have no input with respect to their content. Vehicle manufacturers like Defendants are also legally required to affix a window sticker to every vehicle offered for sale in the United States pursuant to the Automobile Information Disclosure Act of 1958, 15 U.S.C. §§ 1231, *et seq*., which, among other things, prohibits the removal or alteration of the sticker by anyone other than the ultimate purchaser prior to the sale of the car, including the dealership at which the vehicle is offered for sale.

38. JLR-NA and JLR-UK are collectively referred to in this complaint as "JLR" or "Defendants" unless identified separately.

39. JLR engages in continuous and substantial business in New York.

40. Based upon information and belief, Plaintiffs allege that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each other, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each other. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each Defendant.

## TOLLING OF STATUTES OF LIMITATION

41. Any applicable statute(s) of limitations has been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Class could not have reasonably discovered the true, latent nature of the Defect until shortly before this class action litigation was commenced.

42. Defendants were and remain under a continuing duty to disclose to Plaintiffs and members of the Class the true character, quality, and nature of the Class Vehicles, that the Defect is a safety related defect, and that it diminishes the resale value of the Class Vehicles. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

### Background on Power Steering Systems

43. The Class Vehicles, like most modern automobiles, use a power assisted steering system that allows the driver to control the direction of the front wheels by turning the steering wheel. Steering a vehicle - particularly at low speeds or when stopped - requires substantial force because the front tires must overcome friction with the road surface. Without assistance, steering would be difficult or impractical for many drivers, especially during parking maneuvers, tight turns, or emergency situations. To address this, vehicles are equipped with power steering systems, which reduce the physical effort required to turn the steering wheel while maintaining predictable and controllable steering response. Power steering is therefore a safety-critical system, as it directly affects the driver's ability to maneuver and control the vehicle.

44. Historically, vehicles used hydraulic power steering systems. In a hydraulic system, a belt-driven pump—powered by the engine—circulates pressurized hydraulic fluid through hoses

connected to the steering rack. When the driver turns the steering wheel, valves direct pressurized fluid to assist in moving the steering rack left or right, reducing steering effort.

45. Hydraulic power steering systems rely primarily on mechanical and fluid components, and steering assistance is largely continuous and proportional to engine operation. While effective, hydraulic systems are less efficient, require ongoing maintenance, and operate continuously even when steering assistance is not needed.

**The Transition to Electronic Power Steering**

46. Some modern vehicles, including the Class Vehicles, use Electronic Power Steering systems instead of hydraulic systems. EPS eliminates hydraulic fluid and mechanical pumps and instead uses electric motors and electronic control systems to provide steering assistance.

47. In an EPS system: (a) sensors measure the driver's steering input, vehicle speed, and other operating conditions; (b) an electronic control module processes this data in real time; and (c) an electric motor applies precise steering assistance through the steering rack

48. EPS systems are designed to vary steering assistance depending on conditions—providing greater assistance at low speeds (such as parking) and reduced assistance at higher speeds to improve stability and road feel.

49. Unlike hydraulic systems, EPS systems are entirely dependent on electronics, including circuit boards, sensors, wiring, and software. If these electronic components malfunction, steering assistance can be reduced, become unpredictable, or be lost entirely.

50. In the Class Vehicles, the EPS motor and electronic control module are integrated into the steering rack assembly, which directly controls the movement of the front wheels. When operating properly, because EPS systems continuously adjust steering assistance during operation,

they are active at all times while the vehicle is being driven.

**The Steering Defect**

51. The Class Vehicles experience EPS failures caused by defective design and manufacturing of the EPS housing, sealing, and environmental protection, combined with the EPS system's low-mounted placement in a water-exposed location.

52. The EPS motor and electronic control module are integrated into the steering rack and mounted low at the front of the vehicle on the subframe, beneath the engine bay and adjacent to wheel wells and underbody splash zones. This location is routinely exposed to water, road spray, snow melt, and moisture during ordinary and foreseeable vehicle operation, including rain, wet road conditions, and vehicle washing.

53. Despite this known exposure, JLR designed and manufactured the EPS unit with inadequate environmental sealing and hardware. In 2019, JLR recalled 2014-2017 Range Rovers in parts of Canada, because the bolts that attached the electric power steering to the steer gear were prone to corrosion and breakage, causing the power steering to fail.[3] Vehicle owners reported failed power steering even after having the bolts replaced. [4]

54. Furthermore, the EPS housing is not hermetically sealed and contains seams, gaskets, wiring pass-throughs, and electrical connector interfaces that permit water and moisture to enter the housing. Over time, repeated exposure to moisture allows water to intrude into the EPS casing and reach sensitive electronic components.

55. Once inside the EPS housing, moisture accumulates and condenses on internal

---

[3] https://wwwapps.tc.gc.ca/Saf-Sec-Sur/7/VRDB-BDRV/search-recherche/detail.aspx?lang=eng&rn=2019473 (last visited February 20, 2026)
[4] https://www.lrukforums.com/threads/post-n642-recall-steering-rack-failures.296125/ (last visited February 20, 2026)

electronic circuitry, causing corrosion, oxidation, and short-circuiting of the EPS control module and motor electronics. These conditions degrade electrical signals, disrupt sensor feedback, and impair the EPS system's ability to correctly process steering inputs and deliver consistent steering assistance.

56. As a result, the EPS system experiences intermittent malfunctions and eventual failure, including sudden loss or reduction of steering assist, unpredictable changes in steering effort, and warning messages indicating steering system failure. Because the damage is electronic and progressive, EPS failures may occur without warning and may temporarily resolve before recurring, masking the underlying defect.

57. The root cause of the EPS failures is therefore not driver misuse, abnormal driving conditions, or ordinary wear and tear, but rather a uniform design and manufacturing defect that exposes safety-critical electronic components to water intrusion during normal vehicle use. The defect is latent at the time of sale and inevitable over the vehicle's service life, as moisture exposure and seal degradation are foreseeable consequences of the EPS system's design, manufacturing and placement.

**Defendants' Knowledge of the Defect**

58. Upon information and belief, Defendants regularly monitor the NHTSA databases as part of their ongoing obligation to identify potential defects in their vehicles. Examples of the complaints about Class Vehicles can be found below. The below sources establish that Defendants knew, or should have known, of the Defect based on publicly available information through (1) Defendants' own records of customers' complaints, (2) dealership repair records, (3) records from NHTSA, (4) warranty and post-warranty claims, (5) pre-sale durability testing and part sales, and (6) other various sources.

### 1. Defendants' Pre-Sale Testing and Quality Control Measures

59. Defendants are experienced in the manufacture of consumer vehicles. As an experienced manufacturer, Defendants conduct tests, including pre-sale durability testing, on incoming components, including the EPS, to verify that the parts are free from defects and align with Defendants' specifications.

60. Defendants' presale durability testing includes a "punishing test and development regime" where "[a] fleet of development vehicles is being subjected to a year of grueling tests, covering millions of miles between them to ensure [every Range Roger vehicle] achieves the same standards."[5]

61. Defendants further state that "[a] team of engineers dedicated to prototype development and testing is travelling to over 20 countries to test in extremes of climates over a variety of road surfaces and altitudes across the globe. From the frozen extremities of Europe and Canada, to the searing heat and dust of the deserts in the Middle East and America, to the Autobahns in Europe and city traffic in Tokyo, the Range Rover Evoque is being validated against every element on earth" which is "exactly the same punishing test and development regime as the larger Range Rover models."[6]

62. This includes "[o]ver 16,700 tests . . . across all components and systems. Some of the most punishing test regimes include" tests of the "chassis, engine, driveline, and braking components" as well as tests by Defendants' "dynamics specialists . . . to deliver a more agile and connected drive." To deliver the proper handling, "key engineering steps were required" which include "optimizing the stiffness of the chassis systems and body structure, followed by meticulous

[5] *See* https://media.landrover.com/en-us/news/2011/03/all-new-range-rover-evoque-personalized-suit-each-individual-customer (last visited February 20, 2026).
[6] *Id.*

tuning of the suspension components and electric power assisted steering (EPAS) system." According to Defendants, their "[o]ver 40 years of expertise in body and chassis systems, four wheel-drive drivelines and multi-terrain technologies have been applied to the Range Rover Evoque, to ensure that it delivers the refined performance and all-weather, multi-surface capability which are hallmarks of the brand."[7]

63. Defendants also "paid obsessive attention to detail over the engineering of every single component, [and] exhaustively tested . . . in the most challenging conditions to ensure that it will exceed the expectations of our customers around the world." Defendants state that "[t]he work done here makes sure that, whether on asphalt, snow or ice, the F-PACE delivers the connected steering feel and agility fundamental to Jaguar dynamics DNA."[8]

64. Defendants also subjected their Defender development fleets to "more than 45,000 individual tests in some of the world's most inhospitable places." This specifically includes testing vehicle dynamics in Germany and Sweden, strength and durability testing in Belgium, on- and off-road driving dynamics in the UK, wet grip and handling in France, and vehicle stability control in Italy.[9]

**2. Complaints by Other Class Members**

65. Plaintiffs' experiences are by no means isolated or outlying occurrences. Indeed, the internet is replete with examples of blogs and other websites where consumers have complained of the exact same Defect in the Class Vehicles.[10]

---

[7] *Id.*
[8] https://media.landrover.com/en-us/news/2015/07/jaguar-f-pace-tested-extreme (last visited February 20, 2026).
[9] https://media.jaguarlandrover.com/news/2019/04/new-land-rover-defender-reaches-12-million-kilometre-test-and-development-milestone (last visited February 20, 2026).
[10] *See* https://www.velarforums.co.uk/threads/faulty-power-steering-and-2-months-waiting-for-repair.5289/ (last visited February 20, 2026); https://www.fpaceforums.co.uk/threads/road-

66. The Office of Defects Investigation within NHTSA conducts defect investigations and administers safety recalls to support NHTSA's mission to improve safety on the Nation's highways. All vehicle manufacturers, including Defendants, are legally obligated to routinely monitor and analyze NHTSA complaints in order to determine whether vehicles or automotive components should be recalled due to safety concerns, and Defendants thus have knowledge of any and all NHTSA complaints. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

67. The following is just a small sampling of the many complaints submitted to NHTSA by Class Vehicle owners. These publicly available complaints evidence Defendants' knowledge of the Defect, the negative experiences encountered by Class Members, and the financial burden this places on them.

**NHTSA ID Number:** 11497325
**Incident Date:** December 13, 2022
**Consumer Location:** WESTON, CT
**Vehicle Identification Number:** SALEX7RU7N2******
**Summary of Complaint**
Went to turn on vehicle and experienced a complete shutdown of power steering system. Lane assist not available message was the only error presented.

**NHTSA ID Number:** 11448727
**Incident Date:** January 24, 2022
**Consumer Location:** DAYTON, NV
**Vehicle Identification Number:** SALEPERU4N2******
**Summary of Complaint**
Power steering failed upon starting the car after 12 hours of non use. The lane assist light came on saying it was unavailable. Upon first starting it did not move in drive or reverse but was able to after a few restarts but the steering was still failing. I am worried about the steering failing while driving.

**NHTSA ID Number:** 11444859
**Incident Date:** December 15, 2021
**Consumer Location:** LANGHORNE, PA
**Vehicle Identification Number:** SALE3ERU9N2******

---

flooding-power-steering-failure.5475/#replies (last visited February 20, 2026); https://www.rangerovers.net/threads/electrical-faults-errors-power-steering-not-functioning-2017-range-rover-autobiography-l405.360625/ (last visited February 20, 2026).

**Summary of Complaint**
I started my vehicle as usual, everything looked ok except “lane assist not available!” was showing on the driver's screen, and when I wanted to drive away, the steering wheel was unresponsive, but I could drive the vehicle forward and in reverse. Also, the main interactive display was slightly dimmed. I tried a couple of restarts (engine off, lock and leave for 30mins) to no avail. I called Recovery and they delivered the car to the Dealership who undertook several tests but couldn't locate the problem; rebooting some of the connections worked (see attached detail photo from their report). I asked if this could happen at high speed, and the service manager's response was "I'm gonna say no".

**NHTSA ID Number:** 11662705
**Incident Date:** September 30, 2024
**Consumer Location:** ORISKANY FALLS, NY
**Vehicle Identification Number:** SALVP2RX7JH******
**Summary of Complaint**
When traveling on [XXX] in New York, at 78 mph, my 2018 Range Rover Evoque experienced an electronic power steering rack failure I had just picked up my neighbors from the airport and were on the way home. When traveling on a smooth, straight highway, the audible notification alerted and a message on the dash appeared stating "power steering reduced". When just trying to change lanes on the straight highway I would feel the strong resistance. When exiting the Interstate my neighbor sitting in the passenger seat even helped me with turning the wheel on the exit ramp. We manage to make it back to my driveway. My wife normally drives this vehicle and if it was her driving at the time of the failure in our more rural area, there is no doubt she would not have been able to steer and would have crashed with a high possibility of personal injury. There is no way she would have had the strength to control the vehicle. The possibility of injury or death is high. If that had happened legal action would have been taken. I had the vehicle towed 90 miles to the JLR dealership and they eventually completed the fix by replacing the electronic power steering rack at a cost of over $6k. There was much discussion with the dealership about the failure and the kept saying nothing could be done. I chose to pay for the repair only because I wasn't going to continue making monthly payments for a vehicle i couldn't use, or even move. There is a recall in regards to steering rack bolts. However my vehicles VIN is just shy of meeting the require range. Cost of tow, fix, and travel to pick it up after the repair is close to $7k. The large amount of added debt is a huge inconvenience for a repair that should be covered by a major part that was defective. I have attached the dealer repair estimate, the dealer repairs made, and the text communication with the dealership in regards to the steering rack failure.

**NHTSA ID Number:** 11665809
**Incident Date:** June 8, 2025
**Consumer Location:** Unknown
**Vehicle Identification Number:** SALZT2FX5MH******
**Summary of Complaint**
Loss of power steering assist while turning, second occurrence Rover issued a TSB N614NAS2 UPS8021-5B for this very issue however our 2021 Evoque is not listed There is no loss of fluid , contributing to this issue First occurrence showed SOS message in display Second occurrence showed lane assistance The dealer is Baker Jaguar and Land Rover of Charleston The vehicle

was towed to their dealership for assessment of the steering issue There should be a safety recall issued for this issue because the loss of power steering especially while turning could result in an accident Thanks

**NHTSA ID Number:** 11471022
**Incident Date:** June 19, 2022
**Consumer Location:** CINCINNATI, OH
**Vehicle Identification Number:** SALRR2RV8K2******
**Summary of Complaint**
Suddenly, one morning on my way to work the steering became extremely heavy and the handling became very dull. The steering wheel still turned the wheels, but it required a vast amount of effort where the previous day the steering wheel could have been turned with one finger. There were no noises coming from the steering column, or warning lights associated with the defect. No smells associated with friction from parts rubbing together, either. Totally silent. I consulted the manual and no mention was made re: what was happening. It had advised to call an authorized dealer to have it inspected. A trip to the dealership confirmed that the steering gear assembly (a $5,000 part) had failed and needed to be replaced. The dealership did not make mention of this issue being common, or even having happened recently with a similar model/year. There is almost no power assistance coming through the steering, and I am worried about what could happen as a result. Perhaps the steering itself will become impossible? The dealer was uncertain as to whether it posed a greater issue or was just "an annoyance".

68. There are also dozens of other websites and groups on various social media platforms filled with owners complaining of experiencing the Defect in their Class Vehicles.

**Warranty Practices**

69. Despite longstanding knowledge of the Defect as set forth above, Defendants refuse to provide warranty coverage for the repairs when the Defect manifests.

70. Defendants provide a 4-year/50,000-mile (whichever occurs first) New Vehicle Limited Warranty ("NVLW"). Each vehicle also carries a separate, six-year/unlimited mileage corrosion perforation warranty.[11]

71. Nevertheless, when Class members seek warranty coverage for the Defect, even within the warranty period, Defendants often fail to respond or deny warranty coverage, frequently

[11] https://www.landroverusa.com/ownership/vehicle-warranty.html (last visited February 20, 2026).

claiming that the Defect falls under the warranty's "wear and tear" exception.

72. Moreover, some Class Vehicles manifest the Defect just outside Defendants' warranty period. But the mileage and temporal limitations Defendants impose on their warranty are unconscionable and unenforceable.

73. Defendants provide this New Vehicle Limited Warranty to buyers after a purchase is complete. Buyers like Plaintiffs and Class members lack pre-sale knowledge of the Defect or the ability to bargain as to the terms of the Defendants' warranty. Accordingly, the limitations Defendants impose on the Limited Warranty—and their efforts to disclaim any implied warranties—are procedurally unconscionable because there was unequal bargaining power between Defendants and Plaintiffs and the Class members, as, at the time of purchase, Plaintiffs and the other Class members had no other options for purchasing from Defendants alternative warranty coverage for the Class Vehicles.

74. All of the purported limitations on the warranty, including the time and mileage limits, are also substantively unconscionable. Defendants knew Class Vehicles suffered from the Defect and that the Defect would continue to pose safety risks after the warranty purportedly expired, yet Defendants failed to disclose the Defect to Plaintiffs and the other Class members while continuing to market Class Vehicles as safe and reliable. Defendants' enforcement of those limitations is thus harsh and shocks the conscience.

75. Defendants' efforts to evade their warranty obligations with respect to the known Defect, coupled with their refusal to cover the Defect if it manifests outside the warranty's stated term, deprives Plaintiffs and Class members of the benefit of their bargain, forcing them to pay out of pocket to repair a defect present in Class Vehicles at the time of purchase.

## CLASS ACTION ALLEGATIONS

76. Plaintiffs bring this action on behalf of themselves, and on behalf of the following class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3). Specifically, the proposed class is defined as follows:

> **Nationwide Class:**
> All persons or entities who are: (1) current or former owners and/or lessees of a Class Vehicle; and (2) reside in the United States.
>
> **New York Class:**
> All persons or entities who are: (1) current or former owners and/or lessees of a Class Vehicle; and (2) reside in New York.

77. Together, the Nationwide Class and the New York Class shall be collectively referred to herein as the "Class."

78. Excluded from the Class are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Class definitions after conducting discovery.

79. Numerosity: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe that hundreds of thousands of Class Vehicles have been sold and leased throughout the United States, including tens of thousands within New York.

80. Existence and Predominance of Common Questions of Fact and Law: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions

include, but are not limited to:

a. whether the Class Vehicles are predisposed to the Defect;

b. whether Defendants knowingly failed to disclose the existence and cause of the Defect;

c. when Defendants first learned of the Defect;

d. whether Defendants' conduct constitutes a violation of the state consumer protection statutes asserted herein;

e. whether Defendants' conduct violates the Magnuson-Moss Warranty Act;

f. whether Defendants' conduct constitutes a breach of express warranty;

g. whether Defendants' conduct constitutes a breach of implied warranty;

h. whether Defendants' conduct constitutes common law fraud;

i. whether Defendants' conduct constitutes unjust enrichment; and

j. whether Plaintiffs and the Class members are entitled to monetary damages and/or other remedies and, if so, the nature of any such relief.

81. Typicality: Plaintiff's claims are typical of the claims of the Class since Plaintiff and each member of the Class purchased or leased a Class Vehicle with the Defect. Furthermore, Plaintiff and all members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Defendants' wrongful conduct. Plaintiff is advancing the same claims and legal theories on behalf of themselves and all absent Class members.

82. Adequacy: Plaintiffs is an adequate representative because his interests do not conflict with the interests of the Class that he seeks to represent, he has retained counsel that are competent and highly experienced in complex class action litigation, and he intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

83. Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injury suffered by

each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class to individually and effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation also increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers (VINs), warranty claims, registration records, and the database of complaints.

84. Injunctive Relief: Pursuant to Fed. R. Civ. P. 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, corresponding declaratory relief, or final equitable relief with respect to the class as a whole.

**FIRST CAUSE OF ACTION**
**VIOLATION OF NEW YORK GENERAL BUSINESS § 349**
**N.Y. GEN. BUS. LAW § 349**
**(On Behalf of the New York Class)**

85. Plaintiff Evans and the New York Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

86. Plaintiff Evans brings this claim on behalf of himself and on behalf of the New York Class against Defendants.

87. Plaintiff, the members of the New York Class and Defendants are all "persons" under N.Y. Gen. Bus. Law § 349(h).

88. The sale and distribution of the Class Vehicles in New York constitutes a consumer-oriented act and occurred in the conduct of trade or commerce and thereby is governed by the New York deceptive acts and practices statute, General Business Law § 349 ("GBL § 349").

89. GBL § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section of New York law.

90. In violation of the GBL § 349, Defendants failed to disclose and actively concealed the Defect in the Class Vehicles, by marketing them as safe, reliable, functional, and of high quality, and by presenting themselves as a reputable manufacturer that values safety, Defendants engaged in deceptive business practices in violation of GBL § 349. Defendants deliberately withheld the information about the propensity of the Defect to cause failure of the EPS system and other issues as described herein. Further, Defendants knew, or should have known, that such problems could cause the Class Vehicles to become involved in collisions or other accidents, putting vehicle operators, passengers and other motorists at risk for injury. Defendants deliberately engaged in deceptive business practices prohibited by the GBL § 349 by concealing and failing to disclose this material information to ensure that consumers would purchase the Class Vehicles and spend money repairs that Defendants should have covered under warranty.

91. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the Defect. Defendants compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, functional, and of high quality despite containing the Defect, and by claiming to be a reputable manufacturer that values safety.

92. Defendants' deceptive trade practices were likely intended to deceive a reasonable consumer. Plaintiff and members of the New York Class had no reasonable way to know that the Class Vehicles contained the Defect, which were defective in materials, workmanship, design and/or manufacture and posed a serious and significant safety risk. Defendants possessed superior knowledge as to the quality and characteristics of the Class Vehicles, including the Defect and its associated safety risks, and any reasonable consumer would have relied on Defendants' misrepresentations and omissions, as Plaintiff and members of the New York Class did.

93. Defendants intentionally and knowingly misrepresented material facts and omitted material facts regarding the Class Vehicles and the Defect present in them with an intent to mislead Plaintiff and members of the New York Class.

94. Defendants knew or should have known that its conduct violated the GBL § 349.

95. Defendants made material statements and/or omissions about the safety, reliability, and functionality of the Class Vehicles and/or the defective EPS system installed in them that were either false or misleading. Defendants' misrepresentations, omissions, statements, and commentary have included selling and marketing Class Vehicles as safe, reliable, and functional, despite their knowing of the Defect and its corresponding safety hazard.

96. To protect their profits, avoid remediation costs and public relation problems, and increase their profits by having consumers pay for any parts and repairs to remedy the Defect, Defendants concealed the defective nature and safety risk posed by the Class Vehicles and existing Defect at the time of sale or lease. Defendants allowed unsuspecting new and used car purchasers and lessees to continue to buy or lease the Class Vehicles and continue to drive them, despite the safety risk they pose.

97. Defendants owed Plaintiff and members of the New York Class a duty to disclose the true safety, reliability, or functionality of the Class Vehicles and the existence of the Defect because Defendants:

a. Possessed exclusive knowledge of the Defect and its associated safety hazard;

b. Intentionally concealed the foregoing from Plaintiff and members of the New York Class; and/or

c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff and members of the New York Class that contradicted these representations, *inter alia*, that the Defect existed at the time of sale or lease which causes the EPS system in the Class Vehicles to fail.

98. Because Defendants and its authorized agents to perform repairs fraudulently concealed the Defect in the Class Vehicles, by denying the existence of the Defect, and now that the Defect has been discovered, the value of the Class Vehicles has greatly diminished, and they are now worth significantly less than they otherwise would be. Further, Plaintiff and members of the New York Class were deprived of the benefit of the bargain they reached at the time of purchase or lease.

99. Defendants' failure to disclose and active concealment of the Defect in the Class Vehicles were material to Plaintiff and members of the New York Class. But for Defendants' actions, Plaintiff and members of the New York Class would not have purchased and/or leased their Class Vehicles, or would have paid less for them.

100. Plaintiff and members of the New York Class suffered ascertainable losses caused by Defendants' misrepresentations and their failure to disclose material information. Had Plaintiff

and members of the New York Class been aware of the Defect that existed in the Class Vehicles and Defendants' complete disregard for the safety of its consumers, Plaintiff and members of the New York Class would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiff and members of the New York Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

101. Plaintiff and members of the New York Class risk loss of use of their vehicles as a result of Defendants' acts and omissions in violation of GBL § 349, and these violations present a continuing risk to Plaintiff and members of the New York Class and the public in general.

102. As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiff and members of the New York Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, which is greater, treble damages up to $1,000, punitive damages to the extent available under law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive conduct, and all other just and appropriate relief available under GBL § 349.

**SECOND CAUSE OF ACTION**
**VIOLATION OF NEW YORK GENERAL BUSINESS § 350**
**N.Y. GEN. BUS. LAW § 350**
**(On Behalf of the New York Class)**

103. Plaintiff Evans and the New York Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

104. Plaintiff Evans brings this claim on behalf of himself and on behalf of the New York Class against Defendants.

105. Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350.

106. The New York General Business Law § 350 ("GBL § 350") makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." Id. False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of … representations [made] with respect to the commodity …" N.Y. Gen. Bus. Law § 350-a.

107. Defendants caused to be made or disseminated through New York, through advertising, marketing, and other publications, including through its agents who its authorized dealers, statements and omissions that were untrue or misleading, and that were known by Defendants, or that through the exercise of reasonable care should have been known by Defendants, to be untrue and misleading to Plaintiff and the members of the New York Class.

108. In violation of the GBL § 350, Defendants failed to disclose and actively concealed the Defect in the Class Vehicles, by marketing them as safe, reliable, functional, and of high quality, and by presenting themselves as a reputable manufacturer that values safety, Defendants engaged in deceptive business practices in violation of GBL § 350.

109. Defendants deliberately withheld the information about the propensity of the Defect to result in failure of the EPS system in the Class Vehicles and other issues as described herein. Further, Defendants knew, or should have known, that such problems could cause the Class Vehicles to become involved in collisions or other accidents, putting vehicle operators, passengers and other motorists at risk for injury. Defendants deliberately engaged in deceptive business practices prohibited by the GBL § 350 by concealing and failing to disclose this material information to ensure that consumers would purchase the Class Vehicles and spend money on repairs.

110. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the Defect. Defendants compounded the deception by repeatedly asserting in marketing and advertising that the Class Vehicles were safe, reliable, functional, and of high quality despite containing the Defect, and by claiming to be a reputable manufacturer that values safety.

111. Defendants' deceptive trade practices were intended to deceive a reasonable consumer. Plaintiff and members of the New York Class had no reasonable way to know that the Class Vehicles contained the Defect, which were defective in materials, workmanship, design and/or manufacture and posed a serious and significant safety risk. Defendants possessed superior knowledge as to the quality and characteristics of the Class Vehicles, including the Defect and its associated safety risks, and any reasonable consumer would have relied on Defendants' misrepresentations and omissions, as Plaintiff and members of the New York Class did.

112. Defendants intentionally and knowingly misrepresented material facts and omitted material facts regarding the Class Vehicles and the Defect present in them with an intent to mislead Plaintiff and members of the New York Class.

113. Defendants knew or should have known that its conduct violated the GBL § 350.

114. Defendants made material statements and/or omissions about the safety, reliability, and functionality of the Class Vehicles and/or the defective EPS system installed in them that were either false or misleading. Defendants' misrepresentations, omissions, statements, and commentary have included selling and marketing Class Vehicles as safe, reliable, and functional, despite their knowing of the Defect and its corresponding safety hazard.

115. Defendants' false advertising was likely to and did in fact deceive reasonable consumers, including Plaintiff and members of the New York Class, about the safety, reliability,

functionality, and true characteristics of the Class Vehicles, the quality of Defendants' brand and the Class Vehicles, and the true value of the Class Vehicles.

116. To protect their profits, avoid remediation costs and public relation problems, and increase their profits by having consumers pay for any parts and repairs to remedy the Defect, Defendants concealed the defective nature and safety risk posed by the Class Vehicles and existing Defect at the time of sale or lease. Defendants allowed unsuspecting new and used car purchasers and lessees to continue to buy or lease the Class Vehicles and continue to drive them, despite the safety risk they pose.

117. Defendants' failure to disclose and active concealment of the Defect in the Class Vehicles were material to Plaintiff and members of the New York Sub-Class. But for Defendants' actions in violation of GBL § 350, Plaintiff and members of the New York Class would not have purchased and/or leased their Class Vehicles, or would have paid less for them.

118. Plaintiff and members of the New York Class risk loss of use of their vehicles as a result of Defendants' acts and omissions in violation of GBL § 350, and these violations present a continuing risk to Plaintiff and members of the New York Class and the public in general.

119. Plaintiff and members of the New York Class have suffered injury-in-fact and/or actual damages and ascertainable loss as a direct and proximate result of Defendants' false advertising in violation of GBL § 350, including but not limited to overpaying for the Class Vehicles, lost or diminished use, enjoyment and utility of such vehicles, and annoyance, aggravation and inconvenience resulting from Defendants' violation of GBL § 350.

120. As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiff and members of the New York Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory

damages in the amount of $500 each for members of the New York Class. Because Defendants' conduct was committed willingly and knowingly, Plaintiff and the members of the New York Class are entitled to recover three times actual damages, up to $10,000.

**THIRD CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**(On Behalf of the Nationwide Class Or, Alternatively, the New York Class)**

121. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

122. Plaintiff Evans brings this cause of action on behalf of himself and the Class against all Defendants, or in the alternative Plaintiff Evans brings this cause of action on behalf of himself and the New York Class.

123. Defendants provided Plaintiff and Class members with the express warranty set forth above.

124. Specifically, Defendants warranted that the Class Vehicles were free from defects in materials or workmanship; and that in the event the Class Vehicles suffered from defects in either of these respects, Defendants would correct such defects at no cost to Plaintiff or the Class.

125. The Class Vehicles were not free from defects in materials or workmanship because they suffer from the Defect.

126. Defendants have refused, and continue to refuse, to comply with the terms of their warranty to correct the Defect outlined above.

127. Plaintiff has complied with his obligations under the express warranty at all times relevant herein.

128. As a result of Defendants' breach of express warranty, Plaintiff and the Class members have suffered damages.

129. Defendants' conduct was done knowingly, wantonly, maliciously, and/or in conscious disregard for the rights of Plaintiff and the Nationwide Class and/or New York Class, justifying the imposition of punitive damages.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
**(On Behalf of the Nationwide Class Or, Alternatively, the New York Class)**

130. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

131. Plaintiff Evans brings this cause of action on behalf of himself and the Nationwide Class against all Defendants, or in the alternative Plaintiff Evans brings this cause of action on behalf of himself and the New York Class.

132. Defendants were at all relevant times the manufacturers, distributors, warrantors, and/or sellers of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

133. Defendants provided Plaintiff and the other Class members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles suffer from the Defect, which causes failure of the power steering system. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

134. Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not experience failing

power steering; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

135. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and the other Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from the Defect.

136. Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301, *et seq.*)**
**(On Behalf of the Nationwide Class Or, Alternatively, the New York Class)**

137. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

138. Plaintiff Evans brings this cause of action on behalf of himself and the Nationwide Class against all Defendants, or in the alternative Plaintiff Evans brings this cause of action on behalf of himself and the New York Class.

139. Plaintiff and the Classes are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

140. Defendants are suppliers and warrantors within the meaning of 15 U.S.C. §§ 2301(4)-(5).

141. The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

142. The warranties described above are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

143. Defendants breached the express warranties by:

a. Providing warranties with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

b. Selling and leasing Class Vehicles that were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

c. Refusing and/or failing to honor the express warranties by repairing or replacing, free of charge, the component parts in order to remedy the Defect.

144. Plaintiff and the other Class Members relied on the existence and length of the express warranties in deciding whether to purchase or lease the Class Vehicles.

145. Defendants breached their implied warranties by selling Class Vehicles that are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles suffer from the Defect, which causes failure of the power steering system.

146. Defendants' breach of the express and implied warranties has deprived Plaintiff and the other Class Members of the benefit of their bargain.

147. The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

148. Defendants have been afforded a reasonable opportunity to cure their breach of the warranties and/or Plaintiff and the other Class members were not required to do so because affording Defendants a reasonable opportunity to cure their breach of warranties would have been futile. Defendants were also on notice of the alleged Defect from the complaints and service requests it received from Class members, as well as from their own warranty claims, customer complaint data, and/or parts sales data.

149. As a direct and proximate cause of Defendants' breach of the warranties, Plaintiff and the Class members sustained damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiff and the other Class members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory attorney fees and/or other relief as deemed appropriate.

**SIXTH CAUSE OF ACTION**
**COMMON LAW FRAUD**
**(On Behalf of the Nationwide Class Or, Alternatively, the New York Class)**

150. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

151. Plaintiff Evans brings this cause of action on behalf of himself and the Nationwide Class against all Defendants, or in the alternative Plaintiff Evans brings this cause of action on behalf of himself and the New York Class.

152. Defendants made material omissions concerning a presently existing or past fact. For example, Defendants did not fully and truthfully disclose to their customers the true nature of the Defect, which was not readily discoverable until years later, often after warranty period expired. As a result, Plaintiff and the Class members were fraudulently induced to lease and/or purchase the Class Vehicles with the said Defect and all of the resultant problems.

153. These omissions were made by Defendants with knowledge of their falsity, and with the intent that Plaintiff and the Class members rely on them.

154. Plaintiff and the Class members reasonably relied on these omissions and suffered damages as a result.

**SEVENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of the Nationwide Class Or, Alternatively, the New York Class)**

155. Plaintiff and the Class incorporate by reference each preceding and succeeding

paragraph as though fully set forth at length herein.

156. Plaintiff Evans brings this cause of action on behalf of himself and the Nationwide Class against all Defendants, or in the alternative Plaintiff Evans brings this cause of action on behalf of himself and the New York Class.

157. This claim is brought in the alternative to Plaintiff's contract-based claims.

158. Plaintiff and members of the Class conferred a benefit on Defendants. Although Plaintiff and the Class did not purchase their vehicles directly from Defendants, the money used to purchase the Class Vehicles and the money for repairs made by authorized dealerships flowed to Defendants.

159. Defendants had knowledge that this benefit was conferred upon them.

160. Defendants have been and continue to be unjustly enriched at the expense of Plaintiff and the Class, and their retention of this benefit under the circumstances would be inequitable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully request that this Court:

A. determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B. appoint Plaintiff as the representative of the Class and his counsel as Class Counsel;

C. award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiff and Class members are entitled;

D. award pre-judgment and post-judgment interest on such monetary relief;

E. grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff and the Class members with appropriate curative

notice regarding the existence and cause of the defect; and to correct their advertising and marketing practices as described herein;

F. award reasonable attorney's fees and costs; and

G. grant such further relief that this Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 25, 2026

Respectfully submitted,

*/s/ Matthew R. Mendelsohn*
Matthew R. Mendelsohn
David M. Freeman
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Tel: (973) 228-9898
Fax: (972) 328-0303
mrm@mazieslater.com
dfreeman@mazieslater.com

Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
**SAUDER SCHELKOPF LLC**
1109 Lancaster Avenue
Berwyn, PA 19312
Tel: (610) 200-0581
Facsimile: 610-421-1326
jgs@sstriallawyers.com
mds@sstriallawyers.com
jbk@sstriallawyers.com

*Attorneys for Plaintiff and the putative Class*